**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA,                          )
ex rel. TRACY L. LOVVORN,                           )
1210 N. Fountain                                    )
Bel Air, Maryland 21015                             )
                                                    )
and                                                 )
                                                    )
STATE OF DELAWARE,                                  )
ex rel. TRACY L. LOVVORN,                           )
                                                    )
and                                                 )
                                                    )
STATE OF INDIANA,                                   )
ex rel. TRACY L. LOVVORN,                           )
                                                    )
and                                                 )
                                                    )
STATE OF MICHIGAN,                                  )
ex rel. TRACY L. LOVVORN,                           )
                                                    )
and                                                 )
                                                    )
STATE OF MINNESOTA,                                 )
ex rel. TRACY L. LOVVORN,                           )
                                                    )
and                                                 )
                                                    )
STATE OF WISCONSIN,                                 )
ex rel. TRACY LOVVORN,                              )
                                                    )
and                                                 )
                                                    )
TRACY L. LOVVORN,                                   )
                                                    )
                    Plaintiffs,                     )
                                                    )
          v.                                        )
                                                    )
EXTENDICARE REAL ESTATE                             )
     INVESTMENT TRUST,                              )
111 W. Michigan Street                              )
Milwaukee, Wisconsin 53203-2903                     )

10    1580

**FILED UNDER SEAL**

Civil Action No._____

**JURY TRIAL DEMANDED**

FILED

APR 09 2010

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

and                                                     )
                                                        )
EXTENDICARE HEALTH SERVICES, INC.,                      )
111 W. Michigan Street                                  )
Milwaukee, Wisconsin 53203-2903                         )
                                                        )
and                                                     )
                                                        )
PROGRESSIVE STEP CORPORATION,                           )
111 W. Michigan Street                                  )
Milwaukee, Wisconsin 53203-2903                         )
                                                        )
           Defendants.                                  )
_____        )

## COMPLAINT
(Federal and State False Claims Acts; Whistleblower Protection Provisions)

## PRELIMINARY STATEMENT

This Complaint alleges that Extendicare Real Estate Investment Trust, Extendicare

Health Services, Inc., and Progressive Step Corporation, related companies that own and operate

skilled nursing facilities nationwide, and their divisions and affiliates (collectively "Extendicare"

or "Defendants"), have violated the False Claims Acts ("FCAs") of the United States and the

States of Delaware, Indiana, Michigan, Minnesota, and Wisconsin.  This complaint further

alleges that, because of Plaintiff's lawful efforts to stop the Defendants' FCA violations,

Extendicare terminated her employment, in violation of "whistleblower protection" provisions

set forth in the federal and Wisconsin FCAs.  The Defendants' conduct that resulted in violations

of the federal and state FCAs included: (1) ramping up the amount of rehabilitation therapy

provided to Medicare Part A and Medicaid patients during payer "assessment periods" to get

payments for levels of service that were not warranted or provided; (2) ramping down the

rehabilitation therapy provided outside the assessment periods, resulting in the denial of

2

medically necessary services that were paid for by Medicare; (3) denying medically necessary services to patients covered by Medicare managed care plans; (4) upcoding the Rehabilitation Utilization Group ("RUG") classifications for Medicaid patients; and (5) denying medically necessary services to Medicaid patients. To date, these schemes have cost the federal and state Governments tens of millions of dollars. Plaintiff Tracy L. Lovvorn, by the undersigned counsel, brings the *qui tam* claims in this lawsuit on behalf of and in the name of the United States of America, and in the name of the States of Delaware, Indiana, Michigan, Minnesota, and Wisconsin, and brings the statutory claims for retaliatory discharge in her own name and behalf, and alleges:

## JURISDICTION AND VENUE

1.       Counts I, II, and III are civil actions by Plaintiff Tracy L. Lovvorn, acting on behalf of and in the name of the United States, against Defendants under the federal False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

2.       Count IV is a civil action by Plaintiff Tracy L. Lovvorn, acting on behalf of and in the name of the State of Delaware, against Defendants under the Delaware False Claims and Reporting Act, 6 Del. C. § 1201, *et seq*. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(b), because the violations are from the same transactions or occurrences that are the subject of the federal False Claims Act claims alleged in Counts I-III. This Court also has supplemental jurisdiction over Count IV under 28 U.S.C. § 1367, because Count IV and Counts I-III form part of the same case or controversy.

3.       Count V is a civil action by Plaintiff Tracy L. Lovvorn, acting on behalf of and in the name of the State of Indiana, against Defendants under the Indiana False Claims &

3

Whistleblower Protections Law, Ind. Code § 5-11-5.5-1, *et seq*. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(b), because the violations are from the same transactions or occurrences that are the subject of the federal False Claims Act claims alleged in Counts I-III. This Court also has supplemental jurisdiction over Count V under 28 U.S.C. § 1367, because Count V and Counts I-III form part of the same case or controversy.

      4.      Count VI is a civil action by Plaintiff Tracy L. Lovvorn, acting on behalf of and in the name of the State of Michigan, against Defendants under the Michigan Medicaid False Claims Act, Mich. Code 400.601 *et seq*. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(b), because the violations are from the same transactions or occurrences that are the subject of the federal False Claims Act claims alleged in Counts I-III. This Court also has supplemental jurisdiction over Count VI under 28 U.S.C. § 1367, because Count VI and Counts I-III form part of the same case or controversy.

      5.      Count VII is a civil action by Plaintiff Tracy L. Lovvorn, acting on behalf of and in the name of the State of Minnesota, against Defendants under the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq*. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(b), because the violations are from the same transactions or occurrences that are the subject of the federal False Claims Act claims alleged in Counts I-III. This Court also has supplemental jurisdiction over Count VII under 28 U.S.C. § 1367, because Count VII and Counts I-III form part of the same case or controversy.

      6.      Count VIII is a civil action by Plaintiff Tracy L. Lovvorn, acting on behalf of and in the name of the State of Wisconsin, against Defendants under the Wisconsin False Claims For Medical Assistance Act, Wis. Stat. §20.931 *et seq*. This Court has jurisdiction pursuant to 31 U.S.C. § 3732(b), because the violations are from the same transactions or occurrences that are

the subject of the federal False Claims Act claims alleged in Counts I-III. This Court also has supplemental jurisdiction over Count VIII under 28 U.S.C. § 1367, because Count VIII and Counts I-III form part of the same case or controversy.

7.    Count IX is a civil action by Plaintiff Tracy L. Lovvorn against Defendants under the "whistleblower protection" provision of the federal False Claims Act, 31 U.S.C. § 3730(h). This Court has jurisdiction pursuant to 28 U.S.C. § 1331, and 31 U.S.C. §§ 3730(h) and 3732(a).

8.    Count X is a civil action by Plaintiff Tracy L. Lovvorn against Defendants under the "whistleblower protection" provision of the Wisconsin False Claims Act, Wis. Stat. §20.931(14). This Court has supplemental jurisdiction over Count X under 28 U.S.C. § 1367, because Count X and Counts I-III and IX form part of the same case or controversy.

9.    This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because the Defendants maintain facilities and transact business in this judicial district.

10.   Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a), because the Defendants maintain facilities and transact business in this judicial district, and some of the alleged acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

11.   The allegations and transactions set forth in this Complaint have not been publicly disclosed through any of the means enumerated in 31 U.S.C. § 3730(e)(4)(A).

12.   Tracy L. Lovvorn has direct knowledge of the matters alleged herein, derived through her employment with Defendants, and her knowledge is independent from any allegations or transactions that may have been publicly disclosed through any of the means enumerated in 31 U.S.C. § 3730(e)(4)(A). Prior to filing this Complaint, Ms. Lovvorn voluntarily provided the information set forth herein to the Government.

5

## **PARTIES**

13.     Plaintiff Tracy L. Lovvorn ("Relator" or "Plaintiff") resides in Bel Air, Maryland. Ms. Lovvorn is experienced in both physical therapy and the operations and management of rehabilitation and therapy practices. After earning her Master of Physical Therapy Degree in 1998, she served as a clinical therapist for eight years in environments ranging from high-volume, orthopedic-sports medicine facilities to acute hospital and intensive care units. In June 2004, she joined PeopleFirst Rehabilitation, part of Kindred Healthcare, and was quickly promoted to Multisite-Rehabilitation Manager and then to Area Rehabilitation Director in April 2007. In her 10 years in these positions, Ms. Lovvorn gained a thorough knowledge of Medicare compliance management, the RUG system, Activities of Daily Living coding, and therapy-minute planning and scheduling. Because of Ms. Lovvorn's qualifications and experience, Progressive Step Corporation, d/b/a "ProStep," a division of Extendicare, hired her as Area Director of Rehabilitation ("ADR") for its Eastern Area in October 2008. In her role as ADR, Ms. Lovvorn provided operational and clinical oversight of rehabilitation services provided by ProStep at Extendicare's Skilled Nursing Facilities ("SNFs") in Pennsylvania and Delaware. After Ms. Lovvorn first became aware that Extendicare was engaging in inappropriate practices and submitting false claims to government health insurance programs, she began to investigate the misconduct. Beginning in August 2009, Ms. Lovvorn reported the misconduct, both orally and in writing, to her immediate supervisors and to Extendicare's corporate management. Immediately after Ms. Lovvorn complained to her supervisors, they began to engage in a campaign of retaliation and harassment against her, ultimately leading to Defendants' termination of Plaintiff's employment on November 16, 2009.

6

14.     Defendant Extendicare Real Estate Investment Trust, a Canadian-based company, is a leading North American provider of long-term and short-term senior care services.

15.     Defendant Extendicare Health Services, Inc. ("EHSI") is a wholly-owned subsidiary of Defendant Extendicare Real Estate Investment Trust. EHSI owns and operates approximately 181 combined long-term care ("LTC") units and skilled nursing facilities ("SNFs"), with approximately 17,900 beds, throughout the United States. EHSI owns and operates facilities in Delaware, Idaho, Indiana, Kentucky, Michigan, Minnesota, Ohio, Oregon, Pennsylvania, Washington, West Virginia and Wisconsin. EHSI facilities offer nursing care, assisted living and related medical specialty services. Many elderly residents stay in these facilities on a short-term basis immediately following their discharge from hospitals so that they can receive rehabilitation services covered by traditional Medicare Part A or Medicare HMOs. Other residents stay on a long-term basis in the LTC unit with coverage under Medicaid and Medicare Part B.

16.     Defendant Progressive Step Corporation ("ProStep") is a division of Defendant EHSI. ProStep provides physical therapy at EHSI's facilities.

17.     The Center for Medicare and Medicaid Services ("CMS") is an agency of the United States, under the Department of Health and Human Services ("DHHS"). CMS administers and oversees the federal Medicare program and the joint federal-state Medicaid program, under which health care providers may be paid with federal funds for providing, *inter alia*, rehabilitation therapy in SNFs and LTC units.

18.     The States of Delaware, Indiana, Michigan, Minnesota, and Wisconsin all participate in the federal Medicaid program, under which health care providers may be paid with state funds for providing, *inter alia*, rehabilitation therapy in SNFs and LTC units.

7

## THE MEDICARE AND MEDICAID PROGRAMS

19.     Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.*, establishes the
Health Insurance for the Aged and Disabled Program, popularly known as the Medicare
program. The Medicare program is comprised of two parts. Part A provides basic insurance for
the costs of hospitalization and post-hospitalization care. 42 U.S.C. §§ 1395c-1395i-2 (1992).
Part B is a federally subsidized, voluntary insurance program that pays for a wide range of
medical services and supplies, such as outpatient therapy services. 42 U.S.C. §§ 1395k, 1395l,
1395x(s). Reimbursement for Medicare claims is made by the United States through CMS.
CMS contracts with private health insurance companies called "intermediaries" to pay Part A
claims, and with private health insurance companies called "carriers" to pay Part B claims. 42
U.S.C. § 1395h. In this capacity, the intermediaries and carriers act on behalf of CMS. See 42
C.F.R. §§ 421.100 - 421.128.

20.     Title XIX of the Social Security Act (the "Medicaid Act") authorizes federal
grants to the States for Medicaid programs to provide medical assistance to persons with limited
income and resources. Medicaid programs are administered by States in accordance with federal
regulations. State Medicaid agencies conduct their programs according to a Medicaid State plan
approved by CMS. To carry out the mandates of the Medicaid program, the State agency pays
providers for medical care and services provided to eligible Medicaid recipients.

21.     Although Medicaid programs are administered by the various States, they are
jointly financed by the federal and State governments. The federal government pays its share of
medical assistance expenditures to the State on a quarterly basis according to statements of
expenditures submitted by the State and a formula described in sections 1903 and 1905(b) of the

8

Medicaid Act.  The State pays its share of medical assistance expenditures from state and local

government funds in accordance with section 1902(a)(2) of the Medicaid Act.

## THE RELEVANT REIMBURSEMENT RULES

22.     From a financial standpoint, Extendicare's most profitable patient population

consists of patients who are covered by Medicare Part A.  These patients, nearly all of whom are

65 or older, upon being discharged from a hospital, are admitted to an Extendicare SNF in order

to get skilled nursing services and in many cases rehabilitation services.  Extendicare also serves

a large population of long-term residents who, because of their financial status, have their

residential stays covered by Medicaid.  Where these Medicaid patients are also beneficiaries of

the Medicare program (because of their age), they can also receive professional services,

including rehabilitation services provided by licensed therapists, that are paid for by Medicare

Part B.  In addition, when these Medicaid patients are hospitalized and then discharged from the

hospital back to the Extendicare facility for skilled nursing care, they can be covered by

Medicare Part A before reverting back to Medicaid coverage.  Because of the comparatively low

reimbursement amounts paid by Medicaid, it is more profitable for Extendicare to ensure that

these patients are covered by Medicare Part A during any times these patients may be eligible for

such coverage.  Finally, some Medicare-eligible Extendicare patients are covered by Medicare

HMO plans, also known as Medicare Advantage or Medicare Managed Care Plans, that have

contracted with Extendicare to provide coverage under specified terms.

A.     Medicare Part A

23.     Medicare Part A covers services rendered by a SNF to patients who are enrolled

in Medicare Part A.  Provided that certain conditions are met, the services will be covered for up

to 100 days for any "benefit period," *i.e.*, spell of illness. Pub. 100-2 ("Medicare Benefit Policy Manual"), chapter 3, § 20(B).

24.     In order for the stay to be covered by Part A, the patient must first have been an inpatient of a hospital for a medically necessary stay of at least three consecutive calendar days, and then have been transferred to the SNF within 30 days after being discharged from the hospital. *Id.*, chapter 8, § 20. The patient must require SNF care for a condition that was treated during the qualifying hospital stay, or for a condition that arose while the patient was at the SNF for treatment of a condition for which the patient was previously treated in the hospital. *Id.*

25.     In addition to skilled nursing care, some of these patients may also require rehabilitation therapy, *i.e.* physical, occupational and/or speech therapy. The services must be ordered by a physician. *Id.*, § 30. They must be directly and specifically related to an active written treatment plan that is based upon an initial evaluation performed by a qualified physical therapist after admission to the SNF that is approved by the physician after any needed consultation with the qualified physical therapist. *Id.*, § 30.4.1.1. The rehabilitation therapy must be considered under accepted standards of medical practice to be a specific and effective treatment for the patient's condition. *Id.* The services must be reasonable and necessary for the treatment of the patient's condition; thus, the amount, frequency, and duration of the services must be reasonable. *Id. See also* CMS' Revised Long-Term Care Facility Resident Assessment Instrument User's Manual ("CMS's RAI Version 2.0 Manual," rev. 12/08), ch. 6 at 7-8.

26.     The nature and amount of services provided to Medicare patients in SNFs, including rehabilitation therapy, are supposed to be based on the patient's medical needs as determined by medical professionals, rather than on the provider's financial considerations. The Center for Medicare and Medicaid Services ("CMS") has stated:

10

> Arbitrary decisions by facility administrative staff to override the
> professional decision-making regarding which types and how much
> therapy service are needed by, and will be provided to, the individual
> beneficiary are inconsistent with our requirements for individual
> evaluations by a licensed professional therapist, care plan development
> that involves the physician and the professional therapist, and the strict
> rules we have promulgated regarding supervision of therapy service
> provision when service is provided by someone other than the licensed
> professional.

65 FR 46770, 46774 (July 31, 2000).

27.     Medicare Part A pays for SNF stays based on a prospective payment system

("PPS") that assigns each resident to a payment level based on the applicable RUG category.

There are 53 RUG categories to which a patient can be assigned.  Each category has a different

daily reimbursement rate.  The patient's RUG category depends upon the care and resources the

patient needs, as determined by periodic assessments.  The RUG rates established during the

assessment periods become the basis for reimbursing a set number of days of future care and/or

past care.

28.     For patients who require rehabilitation services, RUG categories are based on

several factors that are measured during various assessment periods: (1) the number of minutes,

days, and disciplines of therapy (*i.e.*, physical therapy, occupational therapy, and/or speech

therapy) that are being provided to the patient; (2) the extent to which a patient requires care

services, as measured by the number of Activities of Daily Living ("ADL"); and, where

applicable, (3) medical documentation in support of "extensive services" received by the patient.

*See generally* CMS's RAI Version 2.0 Manual, ch. 6; Medicare Program Integrity Manual, ch. 6.

29.     The highest-paying rehabilitation RUG category is denoted by "RU," which

means "Rehabilitation Ultra High."  To qualify for that category, a patient must be receiving at

least 720 minutes of therapy in two or more disciplines, as measured over a seven-day

11

assessment (or "look-back") period, with the patient receiving therapy in at least one therapy discipline on five of those seven days. This category is reserved for the minority of patients who are physically capable of and can benefit from such an intensive therapy schedule (nearly two-and-a-half hours daily for five days a week). The second-to-highest RUG category, Rehabilitation Very High ("RV"), requires at least 500 minutes of therapy (one hour and 40 minutes daily for five days per week). This category, like the RU category, is suitable only for those patients who can withstand and benefit from a rigorous therapy schedule. The remaining Rehabilitation RUG categories require fewer minutes, ranging from 325 minutes per week to a minimum of 45 minutes per week.

30.     Between the various threshold numbers of therapy minutes, SNF operators receive the same reimbursement regardless of the number of minutes provided. For example, a provider is paid at the RV level whether it provides a patient with 501 minutes or 719 minutes of therapy during a seven-day assessment period. By contrast, the provider is paid at the higher RU level only if the patient received at least 720 minutes during the assessment period.

31.     The RUG category and, consequently, the level of Medicare reimbursement, also depend on the number of days on which therapy services are provided to the patient during the week. In order to qualify for the RU, RV, or RH (Rehabilitation High) levels of reimbursement, a patient must require (as demonstrated by a doctor's order) and receive therapy in at least one of the disciplines of therapy on a "daily basis," which means receiving the same discipline of therapy at least five days a week; in order to qualify for the RM (Rehabilitation Medium) level, the patient must receive at least five days a week of *some* therapy discipline (*e.g.*, physical therapy on some days, occupational therapy on others). *See* Medicare Benefit Policy Manual, chapter 8, § 30.6.

32.     Assignment to a RUG category also depends on whether the patient is receiving extensive medical services, such as intravenous medications, and the number of care services provided to the patient, as measured by the ADLs.  For example, to qualify for any of the Rehabilitation Plus Extensive Services RUG categories, a patient must have an ADL score of at least 7.  For the two highest paying categories within the Rehabilitation Plus Extensive Services RUG categories -- RU and RV -- patients with ADL scores from 7 to15 are classified as RUL or RVL, while patients with ADL scores from 16 to18 are classified as RUX or RVX.  Areas of assistance that qualify for ADL points include, for example, feeding the patient, dressing the patient, or helping the patient move. Within each RUG category, the reimbursement rate for the "X" level is higher than the reimbursement rate for the "L" level.

33.     Importantly, Medicare Part A pays for SNF care only if the patient is **"correctly assigned"** to a RUG level.  42 C.F.R. § 424.20.  Medicare also requires the facility to conduct an **"accurate … assessment of each resident's functional capacity."**  42 C.F.R. § 483.20.

34.     The difference in reimbursement levels between the various RUG categories is significant: for example, reimbursement is approximately $100 more per day for a patient at the RUX level than for one at the RVX level.  This provides the SNF operator with a strong incentive to increase the number of therapy minutes during an assessment period to reach the next highest RUG category, especially when the patient is receiving enough therapy to come within striking distance of the threshold for reaching the next RUG level.  For this reason, when the SNF has scheduled a patient, for example, for 680 minutes of medically indicated therapy during an assessment period, the SNF can obtain an extra $100 per day for that patient if it can add another 40 minutes to the therapy schedule, thereby moving the patient up to the RU reimbursement level.

13

35.     The financial incentive for the provider to reach this threshold during an assessment period is further heightened by the fact that, once the RUG category is established on the basis of the cumulative total of therapy minutes attained during an assessment period that encompasses the previous seven days, Medicare will pay the provider at that RUG rate for a set number of days. Counting from the date of admission to a SNF, the "5-day assessment," which the SNF can make on its choice of any "reference date" between day 1 to day 8 of the stay (using the cumulative total of therapy provided during the seven days leading up to the reference date), will determine the daily reimbursement rate for days 1 to 14. The "14-day assessment," which the SNF makes on any reference date falling between day 11 and 19, determines the daily reimbursement rate for days 15 to 30; the "30-day assessment," which the SNF makes on any reference date falling between day 21 and 34 of the stay, determines the daily reimbursement rate for days 31 through 60; and the 60-day and 90-day assessments determine the reimbursement rates for the remaining days of the stay.

36.     This has the following effect on reimbursement levels: taking the 5-day assessment as an example, if a SNF patient meets the threshold for the RU category on any of the first eight days of therapy, Medicare A will reimburse the SNF at the RU level through the 14th day after admission, regardless of the actual therapy minutes the patient receives after the assessment reference date. Similarly, for the 30-day assessment, if a SNF patient meets the RU threshold requirement on any day between days 21 and 34, Medicare A will reimburse the SNF at the RU level for the 30 days between days 30 and 60, without further verification that the SNF is continuing to provide the number of therapy minutes it provided on the assessment reference date.

14

37.     As a consequence of this reimbursement structure, a provider that fails to provide enough therapy to a patient to meet the threshold cumulative number of minutes during the various assessment (or "look-back") periods can lose thousands of dollars in reimbursements for therapy on days that fall outside the assessment windows.  For this reason, it is a common and legitimate practice for SNFs to emphasize to their staff the importance of hitting the threshold number of therapy minutes during the assessment periods that best reflects the therapy level that the patient will need and receive during the non-assessment periods.

38.     When a patient stops receiving rehabilitation therapy but continues to receive some skilled nursing services (for example, intravenously-administered antibiotics), pursuant to "Other Medicare Required Assessment" or "OMRA," Medicare Part A will continue paying benefits for up to 10 additional days at the rehabilitation therapy rate, not to exceed the maximum of 100 days covered by the benefit period.  CMS Pub. 100-01 ("Medicare General Information, Eligibility, and Entitlement Manual"), chapter 3, § 10.4.  After those 10 days, if the patient still requires skilled nursing care, the reimbursement level drops to the applicable non-rehabilitation therapy rate.  When the patient is no longer receiving rehabilitation services on a "daily basis" or any skilled nursing services, the patient enters what is known as the "wellness period."

39.     For 30 days after the start of the "wellness period" starts, if the 100 days of benefits have not been exhausted and the same problem flares up again (for instance, for a patient who has had a knee replacement, the knee joint becomes infected), the patient may be re-eligible under Medicare Part A to receive skilled nursing and daily rehabilitation services.  Part A will then resume paying benefits up to the 100 days of eligibility, taking into account all the

days of benefit payments since the first date of admission to the SNF for treatment of that problem.

40.     The "benefit period" ends with the close of a period of 60 consecutive days during which the patient was neither an inpatient of a hospital nor receiving a skilled level of care in a SNF. *Id.*, chapter 3, § 10.4.2. After the completion of this uninterrupted 60-day wellness period, if the patient is readmitted to a hospital for another stay of at least three days, then the patient may be re-admitted to the SNF for a new benefit period, which Medicare Part A will pay for up to 100 days. As long as a person continues to be entitled to hospital insurance under Part A, there is no limit on the number of benefit periods (*i.e.*, spells of illness) the patient may have. *Id.*, chapter 3, § 10.4. During the 60-consecutive-day period of wellness, the patient may still live in the LTC unit and receive some rehabilitation therapy but cannot receive it on a "daily basis" (*i.e.*, five-times-per-week). *Id.*, chapter 3, § 10.4.4. If the patient receives physical therapy on a five-times-per-week basis in the LTC, this would be considered receiving a "skilled level of care," the 60-day wellness period would be interrupted, and the patient would remain ineligible for a new benefit period.

B.     Medicaid and Medicare Part B

41.     Patients at LTC units can also have their stays covered by Medicaid, which pays lower reimbursement amounts than Medicare Part A. When patients are eligible to be covered by both Medicare and Medicaid, they can go through alternating periods of Medicare Part A coverage (for the stay in the SNF), followed by coverage under Medicaid and Medicare Part B (for the stay in the LTC unit). A Medicare/Medicaid beneficiary who has been a long-term patient in an LTC unit might be admitted to a hospital for a three-day stay and, after discharge from the hospital, require daily skilled nursing care in the SNF, during which time the patient

16

may be covered by Medicare Part A for up to 100 days. However, after the 100 days of benefits are exhausted or the patient no longer needs a skilled level of care, the patient -- who physically remains at the Extendicare facility in the LTC unit -- will once again be covered by Medicaid and, to the extent the patient needs rehabilitation therapy, Medicare Part B. As a result, many elderly long-term patients of Extendicare shift back-and-forth between Medicare Part A coverage (which follows hospitalizations) and Medicaid/Medicare Part B coverage (which comes into play after the Part A "benefit period" has elapsed). Extendicare commonly refers to this practice as "recycling" the patients. When the patient's stay is covered by Medicare Part A, any rehabilitation therapy sessions are included in the Part A reimbursement. However, when the stay is not covered by Medicare Part A, Medicare Part B will separately pay Extendicare for therapy provided to LTC residents. *See* Medicare Claims Processing Manual, chapter 7, § 10.1.

  C. <u>Medicare Advantage Plans</u>

  42. Medicare beneficiaries have the option of coverage under Medicare Advantage ("MA") (*i.e.*, Medicare Health Maintenance Organization) plans, in lieu of traditional coverage under Medicare Parts A and B. These Medicare Advantage plans are required to provide beneficiaries with *all* the basic benefits that would be available under Parts A and B. *See* Medicare Managed Care Manual, ch. 4 at §§ 10.2, 10.4, 10.9, and 10.19, and ch. 11 at § 100.1.

  43. Thus, a material term of the contracts between CMS and the MA plans is that the plans must provide "all Medicare covered benefits." *See* Medicare Managed Care Manual, chapter 11, § 100.1, Material Provisions of an MA Contract, and chapter 1, § 20, Definitions (including definition of "basic benefit"). As discussed in the section above on Medicare Part A, Medicare covered benefits include 100 days of *reasonable and medically necessary* SNF care, including rehabilitation therapy. Medicare Benefit Policy Manual, chapter 3, § 20(B).

44.     A Medicare Advantage plan must include the "all Medicare covered benefits"

clause in its agreements with contractors, subcontractors, and first tier and downstream entities.

*See* Medicare Managed Care Manual, chapter 11, § 110.1, General Requirements.

45.     CMS may sanction a Medicare Advantage organization that "fails substantially to

provide, to an MA enrollee, medically necessary services that the organization is required to

provide (under law or under the contract) to an MA enrollee where that failure adversely affects

(or is substantially likely to adversely affect) the enrollee." 42 CFR 422.752(a)(1).

## MS. LOVVORN'S DISCOVERY OF
## EXTENDICARE'S FRAUDULENT PRACTICES

46.     For each resident who received rehabilitation services, Extendicare generated a

document, called a "resident pathway," that tracked on a daily basis the number of minutes of

therapy that were delivered, as well as the number of minutes that were planned, for each of the

therapy disciplines. The resident pathway also highlighted the assessment periods for the patient

and, for each day of the patient's stay, the cumulative seven-day look-back totals for delivered

therapy minutes. Thus, by looking at the resident pathway, an Extendicare administrator or

therapist could easily see a summary of the therapy that was actually provided and was planned,

and most importantly, how much additional therapy would be needed to qualify the patient for

particular RUG categories during assessment periods. Every day, Extendicare's Clinical

Reimbursement Coordinators ("CRCs") would review with the Facility Rehabilitation

Coordinators ("FRCs"), who oversaw the delivery of therapy at each Extendicare facility, the

planned minutes for each patient to ensure that reimbursement could be maximized.

47.     By May 2009, Ms. Lovvorn had begun to suspect Extendicare was engaging in

misconduct in connection with its efforts to maximize reimbursement levels. At that time, she

attended a regular quarterly meeting of the Philadelphia Region FRCs which addressed, *inter*

18

*alia,* the topic of "pathway calls." Extendicare closely monitored all FRCs and their regional counterparts, Regional Directors of Rehabilitation ("RDRs"), whose facilities were not meeting certain monthly financial benchmarks. Extendicare required these FRCs and RDRs to participate at least weekly in "pathway calls," which were conference calls with Extendicare's clinical reimbursement staff. (The clinical reimbursement staff also closely monitored Extendicare's nursing staffing, identifying opportunities to increase reimbursement on that end as well.)

48.     In connection with the pathway call, the Regional Directors of Clinical Reimbursement ("RDCRs") would generate or update a document called a "pathway review." This document was a report that included information about instances where it appeared to the clinical reimbursement staff that the facility might not be maximizing reimbursement. In this process, Extendicare focused primarily on addressing and preventing any so-called "missed opportunities," which was Extendicare's term for any instance where the FRC (or the nursing staff) had not captured the highest RUG rate that the reimbursement staff -- not the clinical staff -- determined was feasible regardless of the patient's actual medical need. Included in this document was an estimate of the dollars Extendicare had lost in connection with each such "missed opportunity."

49.     On the pathway calls, the reimbursement staff would review the resident pathways and question the FRCs in detail. In reality, these pathway calls were a high-pressure tactic, not unlike an inquisition, to force FRCs to maximize any reimbursement opportunities by, for example, ramping up therapy minutes during assessment periods, or ramping down minutes after the assessment period in order not to "overprovide" services that were not yielding additional payment -- again, without regard to the patients' medical needs. The nursing staff was similarly pressured to "find" extra ADL points to qualify patients for higher RUG categories.

After the pathway call, Extendicare would update and circulate a weekly report identifying "missed opportunities" and plans of action.

50.     When they received the missed opportunities reports, Ms. Jan Ricchio, who was Extendicare's Eastern Operations Area Vice President, and Ms. Wanda Kennedy, who was the Eastern Operations Area Director of Clinical Reimbursement, would respond aggressively. They would grill various FRCs about why they had "left money on the table" or allowed the "missed opportunity" -- again, regardless of whether the RUG rate properly reflected the therapy level the doctor had ordered, the therapists believed was clinically appropriate, or that the patient needed or would receive.  The following email that Ms. Kennedy sent to an FRC and a reimbursement coordinator on August 26, 2009, is just one of many examples of how these managers demanded that the therapy staff increase patients' minutes for the sole purpose of raising revenues:

> [Patient AJ] – today is day 8, 690 minutes identified.  I have asked that ST [Speech Therapy] give additional minutes and/or PT [Physical Therapy] and OT [Occupational Therapy] to enable us to get the RU at day 8 vs. the RV.  Back up FRC reluctant to do so as ST already at 400 minutes treat time today.  She did say she would ask ST and would also ask PT and/or OT to pick up some additional minutes.  Hopefully we can get the RUA.  Financial impact is $1509.48.

51.     It is evident from Ms. Kennedy's email that the patient's needs were irrelevant to Extendicare's goals.  Whether the minutes came from physical therapy, occupational therapy, or speech therapy, Ms. Kennedy was determined to "get the RU at day 8," the last allowable day for the 5-day assessment that would determine the patient's RUG level for payment through day 14.

52.     Uncomfortable with this type of pressure, several FRCs reported their concerns about the pathway telephone calls, and the follow-up messages like the one above, to Ms. Lovvorn at the quarterly FRC meeting in May 2009.

53.     In May 2009, Ms. Lovvorn began to investigate these practices, which she believed Extendicare was using to defraud Medicare.  Over the subsequent two months, she

20

spoke with FRCs throughout Pennsylvania and Delaware. Every one of these FRCs expressed concern that Extendicare management was exerting unwarranted pressure on them, especially in the pathway calls and follow-up messages, to ramp up therapy minutes during assessment periods in order to obtain the highest Medicare Part A billing rates.

54.     During the summer of 2009, Ms. Lovvorn directly experienced this pressure, first in June when she filled in as the FRC for the Slate Belt facility in Bangor, Pennsylvania, and again in July and August when she conducted on-site training for two new FRCs: one at the Slate Belt facility, and the other at Spruce Manor. This job required that Ms. Lovvorn work three days per week on site, where she saw how the clinical reimbursement staff and Extendicare's upper-level management pressured the therapists and the FRC to inflate therapy minutes beyond what was medically indicated.

55.     One physical therapist at Slate Belt approached Ms. Lovvorn specifically to complain that she felt pressure from Ms. Ricchio, EHSI Eastern leadership, and the clinical reimbursement staff to increase therapy minutes during assessment periods in order to inflate RUG rates. Ms. Lovvorn was alarmed to hear this from a therapist, as it showed that the company's fraudulent billing practices were corrupting the patient-therapist relationship.

56.     In an effort to determine whether therapists and managers at other Extendicare facilities in her area felt pressure to engage in the fraudulent practices that she had found at both Slate Belt and Spruce Manor, Ms. Lovvorn spoke with her RDR for the Philadelphia Region. Like Ms. Lovvorn, the Philadelphia RDR had been working onsite: in his case, for two weeks at the Dresher Hill facility in Fort Washington, Pennsylvania. The Philadelphia RDR had witnessed the same fraudulent practices and was as alarmed as Ms. Lovvorn. Ms. Lovvorn followed up by speaking with two Dresher Hill therapists who were acting at the time as co-

21

FRCs. They both confirmed that the clinical reimbursement team and Ms. Ricchio were pressuring them (in their view, improperly) to aim for and schedule RUG levels that exceeded the service levels that their patients needed and were able to sustain.

57.     Although Ms. Lovvorn's investigation strongly suggested that the Extendicare clinical reimbursement team and Ms. Ricchio were exerting the unwarranted pressure described above, Ms. Lovvorn further sought to determine whether the pressure, in fact, was actually causing the submission of fraudulent bills to Medicare. With this in mind, at the end of July 2009, Ms. Lovvorn carefully reviewed the resident pathway charts for all patients at several of the facilities in the Eastern Area and also spoke with additional FRCs and therapists. Ms. Lovvorn found that in each of the facilities, the pathway reports demonstrated a billing pattern resembling a "suspension bridge" -- *i.e.*, the cumulative total of therapy minutes would peak sharply during assessment periods and fall away rapidly outside those periods. Moreover, she found that many FRCs and therapists were very concerned that the company's drive to increase therapy minutes during assessment periods was at sharp odds with their patients' clinical needs.

58.     On August 13, 2009, Ms. Lovvorn met with Ms. Ricchio and Ms. Kennedy to discuss some concerns that a Regional Director of Clinical Reimbursement had raised about the performance of the new FRC whom Ms. Lovvorn had trained recently for the Slate Belt facility. Ms. Lovvorn walked Ms. Kennedy though the facility's patient pathways in order to show her and Ms. Ricchio that the new FRC was performing his duties well. To Ms. Lovvorn's alarm, Ms. Ricchio responded, **"There is a concern that the FRC is listening to the therapists when planning the patient's levels, instead of planning the patient to the highest level."** Ms. Ricchio continued, **"We need to be assuming that the patient is an RU upon admission, and we should be planning this from the beginning."** Through these statements, Ms. Ricchio

22

admitted that Extendicare wanted its employees to aim for the highest RUG level -- without regard for the patients' needs as reflected in the therapists' medical assessments and opinions. In response to Ms. Ricchio's statements, Ms. Lovvorn stated that the practices Ms. Ricchio advocated were unlawful and that they resulted in fraud on Medicare. She then detailed her concerns that clinical reimbursement personnel were using the pathway calls to pressure FRCs to inflate the RUG categories, sometimes in knowing disregard for the patient's needs and even to the patient's detriment.

## THE FRAUDULENT PRACTICES

### A.    Upcoding the RUG Classifications for Medicare Part A Patients

59.    Extendicare has been gaming the reimbursement system by providing patients with unnecessary therapy during assessment periods for the sole purpose of improperly obtaining higher RUG levels and, therefore, higher reimbursement from Medicare Part A. Rather than scheduling the patients' therapy during assessment periods at levels that reflect Extendicare's objective, clinical judgment of the patients' medical needs, Extendicare's goal at the outset has been to maximize reimbursement for the patient stays. To that end, Extendicare manipulates therapy schedules during the assessment periods with the single-minded goal of achieving the highest possible RUG categories. In August 2009, Ms. Ricchio admitted to Ms. Lovvorn that, rather than matching the patients' billing levels to the patients' actual needs, "we need to be assuming that the patient is an RU upon admission, and we should be planning this from the beginning." Extendicare's misconduct did not end there, however: Extendicare not only would ramp up the patients' therapy minutes during assessment periods to maximize reimbursements, but also would ramp down the therapy minutes immediately afterwards so that the patients would not receive the level of therapy that was being billed.

23

60.     Extendicare's practices violate the Medicare requirement that a facility develop a comprehensive care plan based on the patient's needs and that it correctly assign the patients to a RUG category. *See* 42 C.F.R. §§ 424.20 and 483.20[1]; *see also* Medicare Benefit Policy Manual, chapter 8, § 30.4.1.1. In fact, on September 30, 2008, the HHS Office of Inspector General issued guidance for nursing facilities, specifically citing this practice as one that could involve fraud:

> The provision of physical, occupational, and speech therapy services continues to be a risk area for nursing facilities. Potential problems include: (i) Improper utilization of therapy services to inflate the severity of RUG classifications and obtain additional reimbursement . . . and (iii) stinting on therapy services provided to patients covered by the Part A PPS payment. . . . These practices may result in the submission of false claims.

Dep't of Health and Human Servs, OIG Supplemental Compliance Program Guidance for Nursing Facilities, 73 Fed. Reg. 56,832, 56,840 (September 30, 2008).

1.     Billing for Therapy Not Needed or Provided

61.     Extendicare has routinely bills Medicare for therapy that it has not provided (and has never intended to provide) to the patient, except during assessment periods. For example, after pressuring its therapists to increase the therapy minutes to 720 minutes during an assessment period for the sole purpose of capturing the higher RU payment rate, the company expects the therapists to ramp down to a lower level of therapy – *i.e.*, far fewer than 720 minutes -- once the assessment period has ended and the RU level has been attained.

---

[1] 42 C.F.R. § 424.20 states that Medicare Part A pays for posthospital care only if the patient needs care that can only be provided in a SNF for a condition that required inpatient hospital treatment and if the patient is "correctly assigned" to a RUG level. 42 C.F.R. § 483.20 requires long-term care facilities to conduct an "accurate ... assessment of each resident's functional capacity."

62.     This pattern is clearly reflected in resident pathway charts that Extendicare maintains for most therapy patients at nearly all of its 21 facilities in the Eastern Area. (Some examples will be discussed below and are attached to this Complaint.) In fact, when plotted on graphs where the vertical axes register therapy minutes and the horizontal axes register days, the therapy regimens of many Extendicare patients reveal a distinct "suspension bridge" pattern, with sharp peaks during assessment periods and deep valleys during non-assessment periods. Remarkably, on many of the resident pathway charts, the assessment periods are virtually the only times that the cumulative therapy minutes for the seven-day "look back" period reach the minimum number required for the RUG level specified in Extendicare's claims to Medicare for reimbursement.

63.     These same pathway charts often demonstrate that while Extendicare ramps up therapy minutes in order to bill patients at the higher RUG levels, Extendicare does not plan to provide the higher level of services once the assessment period has ended. Instead, Extendicare intends to ramp down the therapy minutes as soon as the assessment period is over, and in fact, there is usually a dramatic drop in services immediately after the assessment period ends.

64.     As discussed above, in order to ensure that EHSI therapists were maximizing billings, EHSI administrators would schedule regular pathway calls with the FRCs and others. In these teleconferences, the EHSI administrators would put enormous pressure on the FRCs by trying to identify, and criticizing them for, any "missed opportunities," *i.e.*, any situations where, by failing to provide additional therapy or services, or by not otherwise taking advantage of billing rules, the company had missed out on additional revenues.

65.     One of the common ways that Extendicare ramps up a patient's therapy minutes in the week leading up to the 5-day and 14-day assessment reference dates is to provide the patient

with six or seven days of therapy (including weekend days). Extendicare administrators pressure the FRCs to engage in this practice contrary to doctors' orders that have prescribed therapy on a five-times-per-week basis, and even where such an intensive six-day-a-week regimen could harm the patient. [2] Usually, right after the desired RUG level has been achieved for the assessment reference date, Extendicare lowers the frequency of therapy sessions back to five days a week.

66.     The paragraphs below discuss a few specific examples for the purpose of illustrating Extendicare's misconduct that resulted in the submission of false claims to Medicare.

67.     Patient 1 was admitted to Extendicare's Langhorne Gardens Rehabilitation and Nursing Center on July 30, 2009.[3]  On day 8, she had a cumulative total of 665 minutes of therapy, which fell short of the RU level. In a pathway call, it was noted that she had a "low tolerance" for therapy because of "neuro changes" and "dialysis." The note stated, "trying to ramp up to RU for 14d[ays] using weekend tx[therapy]." The note further stated, "obtained." By day 13, which was an acceptable reference date for the 14-day assessment, Extendicare had provided GR with 735 minutes of therapy for the past seven days, qualifying her at the RU level. She was again qualified for the RU level on day 21, which was the first acceptable reference date for the 30-day assessment. Immediately after that day, however, Extendicare ramped down the

---

[2] The September 2008 OIG guidance noted that pushing patients to receive unnecessary therapy, as EHSI did during assessment periods, exposed the patients to physical harm:

> In addition, unnecessary therapy services may place frail but otherwise functioning residents at risk for physical injury, such as muscle fatigue and broken bones, and may obscure a resident's true condition, leading to inadequate care plans and inaccurate RUG classifications.

OIG Supplemental Compliance Program Guidance 73 Fed. Reg. at 56,840.

[3] Throughout this Complaint, patients are not identified by name or initials but instead are identified simply as "Patient 1," etc.  Similarly, in the exhibits attached to the Complaint, names or numbers that would identify individual patients have been redacted. The Relator knows the identities of these patients and, if the Court requires, can provide them to the Court in a manner that protects the patients' privacy.

therapy for Patient 1, so that after day 22, her cumulative seven-day therapy totals quickly plummeted to below 200. Despite this ramp down, Extendicare billed Medicare for Patient 1's entire SNF stay (from July 30, 2009 through September 3, 2009) at the RU level. (*See* Exhibit 1.)

68.      Patient 2 was admitted to Langhorne Gardens on June 30, 2009. By day 8, she had a total of 750 minutes of therapy, putting her in the RU category. To achieve the 750 minutes, Extendicare treated JC on six out of seven consecutive days, including 50 minutes of therapy on a Sunday. After a drop for several days, JC was back up to the 725 minute level on day 11, again meeting the RU level for the 14-day assessment. Her therapy minutes then dropped rapidly but once again were ramped up so that by day 21, the first allowed day for the 30-day assessment, she was at the 740 minute level -- again after receiving a 50-minute Sunday therapy session. Almost immediately afterwards, JC's therapy totals dropped down to below 500 minutes per week. Despite these ramp downs, Extendicare billed Medicare for Patient 2's entire SNF stay (from June 30, 2009 through August 7, 2009) at the RU level. (*See* Exhibit 2.)

69.      Patient 3 was admitted to Suburban Woods on March 10, 2009. By day 8, after being treated for six out of seven days, he had a total of 735 minutes of therapy, putting him in the RU category. He received three more consecutive days of therapy so that by day 11, the first available reference date for the 14-day assessment, he was at 735 minutes. His therapy sessions were then ramped down, with his cumulative minutes ranging as low as 500 on day 15. With the approach of the 30-day assessment period, however, his therapy was ramped up again, so that by the 30-day assessment reference date (day 23), he was back at 720 minutes. Despite the fact that Patient 3 was classified and billed to Medicare at the RU level between day 31 and day 60, Patient 3 received a much lower level of therapy during nearly all of that time period. By day 31 his cumulative therapy minutes for the seven-day look back period were back below 500, and

27

from days 36 to 57, they were always below 300. Starting on day 55, Extendicare once again ramped up Patient 3's therapy sessions to seven consecutive days, so that by day 61 -- the 60-day assessment reference date -- Patient 3 was back up to 510 minutes (RUG level RV) and the remainder of his SNF stay was billed to Medicare at the RV level. Following the 60 day assessment, the same pattern was repeated, with Patient 3's therapy minutes declining sharply to below 200 cumulative minutes, and then being ramped up again. Starting on day 70, Patient 3 received 12 consecutive days of therapy, so that on day 81 -- the 90-day assessment reference date -- his minutes peaked again at 539 (level RV). Patient 3 presents a classic example of "suspension bridge" billing, as well as Extendicare's practice of providing therapy more than the prescribed five-days-a-week leading up to assessment reference dates. (*See* Exhibit 3.)

70.     Patient 4 was admitted to Havencrest Nursing Center on May 8, 2009. By day 8, she had 750 therapy minutes, making her an RU. After a drop, she was back at 720 minutes on day 13 for the 14-day assessment. Her therapy minutes dropped again, but once again were ramped up so that by day 22 she was at 735 minutes. Again her therapy minutes dropped: for instance, from day 34 to day 49, she never exceeded 500 cumulative therapy minutes for the look-back period. However, her therapy was ramped up again so that on day 56, for the 60-day assessment, Patient 4 was back at 720 minutes. Afterwards, her therapy rapidly diminished so that by day 63 and for the rest of her stay, Patient 4 received less than 100 therapy minutes per week. Nevertheless, Patient 4's entire 74 day SNF stay was billed to Medicare at the RU level. (*See* Exhibit 4.)

71.     Sometimes, as illustrated by the next two patient examples, therapists were severely castigated by Extendicare administrators for failing to ramp up therapy minutes, in spite of the obvious risk that such therapy would have placed on the patient.

72.     Patient 5 had been a long-term resident of the Dresher LTC, and on March 5, 2009, after a hospital stay, she returned as a SNF patient. In an e-mail dated March 18, 2009, Extendicare administrators pointed out a "missed opportunity" with a financial impact of $1595.02, based on Patient 5's "lack of participation" in therapy on day 8 of her Medicare Part A stay. In a reply written on the morning of March 19, the FRC explained that the patient "came back from hospital with participation issues. Everything was going okay and [then on] day 8 **she found out details of a terminal illness she has** in the AM. Were at least able to get some minutes that day to help get RU for 14 day but patient was not happy participating that day." That explanation apparently did not elicit any sympathy from Ms. Ricchio, however, who chimed in: "She was [not] seen 1st 2 days by PT and wasn't seen until Day 5 by OT?" The FRC responded, "All of this was discussed on a RUG call. [Patient's] blood sugar dropped Friday and patient was vomiting all afternoon. PT [evaluated] Saturday." Ms. Richhio rejoined, "The patient was readmitted early on Thursday. Considering that we missed seeing her Thursday, she was sick Friday, why would we only do 20 minutes of therapy on Saturday and none on Sunday in the middle of an assessment period??" The FRC responded, "To answer Jan's question, 20 minutes of therapy on [Saturday was] due again to this being a resident with [a history] of minimal participation and recovering from low blood sugar and vomiting. This patient is a LTC resident with minimal activity and a [history] of being resistive to therapy and to be honest I planned her minutes very aggressively. RU planning was very aggressive for this resident and the staff was very creative in achieving the minutes we got." (*See* Exhibit 5.)

73.     Patient 6 was admitted to the Dresher facility on Saturday, July 25, 2009. Upon initial evaluation and treatments, it was clear that the patient could not tolerate a high level of therapy, due to "her acuity, seizures, and tolerance." The initial entry about Patient 6 in a

pathway review report dated July 29, 2009, notes that she "[w]ill be RVX despite 3 disciplines due to lack of tolerance and need to advance slow." (Exhibit 6.) Nevertheless, in a follow-up e-mail on August 7, 2009, Ms. Kennedy admonished the FRC and others for this "missed opportunity" to achieve RU, saying: "There was no therapy scheduled on the weekend for [Patient 6]. Financial loss of 2300 bucks!!!! We have to step up and make sure that this doesn't happen again!!!!" (*See* Exhibit 6 (all four exclamation points in the original).) This e-mail from Ms. Kennedy triggered a series of responses and explanations, as well as more criticism of the facility's failure to provide enough therapy on the weekends. In an e-mail addressed only to Ms. Lovvorn dated August 17, 2009, the Philadelphia RDR commented:

> Does the [Area Director of Clinical Reimbursement] need to approve of who will and wont be seen on weekends or any other given day going forward? This is not a question of weekend therapy coverage in any way. Again, this patient was never expected or scheduled to reach ... RU for the 5 day assessment, nor were they scheduled for 6 days a week. They would not even be able to be seen on Saturday if it were appropriate unless we would have modified our order to reflect 6 days a week. From a review standpoint, it would have been clear that this day was added solely to capture the higher RUG. This patient ended up being sent to the hospital later in her stay for seizure activity which was the sole reason we planned the way we did, based on what her clinical need and picture is, just like is done for any other patient who enters any of our facilities.

(Exhibit 6.)

74.    In short, as reflected in Extendicare's resident pathway charts and pathway reviews, Extendicare is deliberately gaming the RUG system to obtain Medicare payment for therapy services that the patient does not need and that the SNF does not actually provide. Intentionally overbilling Medicare for services that are not medically necessary constitutes fraud. *See* 42 U.S.C. § 1395y ("[N]o payments may be made under part A or part B for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. . . .").

This practice not only constitutes fraud on the U.S. Government, but also abuses nursing-home patients who cannot comfortably tolerate the escalated therapy levels that Extendicare subjects them to when shooting for the highest (and most profitable) RUG level attainable.

2.      Clustering Therapy Sessions to Misrepresent Their Frequency

75.      Another means used by Extendicare to defraud Medicare is to manipulate the scheduling of therapy sessions to make it appear that patients are receiving therapy on a daily basis when, in fact, they are not. In order to qualify for higher RUG levels of Medicare Part A coverage, a patient must receive treatment on a "daily basis," *i.e.*, five days out of seven. For Medicare Part A patients who have three-times-per-week treatment orders from their doctors – typically, when the patients are already beyond the 14-day assessment period, and the patients' treatment plans have been downgraded -- Extendicare pressures its FRCs and therapists to schedule the patients to receive their treatments on either a Wednesday-Thursday-Friday-Monday-Tuesday schedule or a Thursday-Friday-Monday-Tuesday-Wednesday schedule during the 30-, 60-, or 90-day assessment periods.

76.      In order to get reimbursed under Medicare Part A, after each assessment reference date, a SNF must submit a document called the "Minimum Data Set," or "MDS." For each discipline of therapy, Section O of the MDS requires the provider to disclose the "number of days this therapy was administered for at least 15 minutes a day in the last 7 days." If the answer to this question is "five," then Medicare reimburses on the basis that the patient is receiving therapy on a five-day-a-week basis.

77.      Thus, by clustering the treatment days around the weekend, Extendicare gives Medicare the false impression that the patients are receiving five days of therapy per week -- despite the fact that, at that point, the treatment plan and physician's order call for the patient to

31

receive therapy only three times a week and, in reality, the patients are receiving therapy only three times a week. Once the assessment period is over, consistent with patient's needs, therapists resume scheduling patients to receive therapy either on a Monday-Wednesday-Friday or a Tuesday-Thursday-Saturday, as those schedules allow for rest days between treatment days and for the use of off-days to assess the effects of the treatments. The result of this fraudulent practice is that Medicare is billed for services that Extendicare does not provide, does not intend to provide, are not medically necessary, are not in the treatment plan, and are not ordered by the physician, who instead has ordered that therapy be provided only three days a week.

78.     A June 11, 2009, series of emails from Ms. Kennedy to facility and regional managers demonstrates how Extendicare pushed its FRCs to cluster three-days-a-week treatment orders to deceptively capture five-days-a-week reimbursement levels. Ms. Kennedy asks, "Why didn't we do 3 days one week and 2 days the next or 2 and 3 on [the patient]??" She continued:

> Please review these situations more closely – we really have to watch the ramp down right before a window [*i.e.*, assessment period] so we can capture the most appropriate RUG. Just think if this situation occurred once a month for a whole year at Dresher – financial impact would be $8500.00 for the year in regards to this scenario alone. Think about 22 buildings with this situation each month for an entire year – that would be $187,000.00!!!!!! Even at half of that, we are talking a very large amount of reimbursement.

79.     The resident pathway charts and pathway reviews demonstrate how, during assessment periods, Extendicare would cluster therapy sessions for patients with three-days-a-week treatment orders in order to make it appear that these patients were receiving therapy five days a week. For example, Patient 7 was admitted to Valley Manor Nursing and Rehabilitation Center on December 23, 2008. In the final weeks of the patient's 100-day SNF stay, Patient 7's therapy regimen was reduced to three times per week. However, in order to capture the RH level of reimbursement (which requires five days of therapy per week totaling at least 325 minutes)

32

during the 90-day assessment period, Extendicare clustered three days of therapy on Wednesday, Thursday, and Friday, March 11-13, 2009, and two days of therapy on Monday and Tuesday of the following week. The net result of this manipulation was that Extendicare billed Medicare at the RUG RH reimbursement rate, despite the fact that Patient 7 could not qualify for this level of reimbursement because Patient 7 was receiving therapy three times rather than five times per week. (Exhibit 7.) Extendicare's "clustering" policy is also reflected in comments in pathway review reports. For example, the Statesman Facility pathway review report for the week of November 19, 2008, contains the following note for Patient 8: "OT treating 3 times a week, OT treating Wed. Thur. Fri. Mon. Tues to obtain RM on the 14 day." (Exhibit 8.) A patient cannot be considered an "RM" unless the patient is receiving rehabilitation therapy five times per week.

### 3.   Billing for ADL Services Not Needed Or Provided

80.   Extendicare exerted pressure on certified nursing assistants ("CNAs") to provide patients with care services, and thus to earn ADL points, that were unnecessary, and also exerted pressure on personnel to bill for care services that were not provided. For example, Extendicare had an unwritten rule that was in effect during the patient's initial 5-day assessment period whereby at night, two CNAs were supposed to answer a call light, even though one CNA could have responded; in this way, Extendicare could claim two ADL points, rather than one. Or, when a patient had 15 ADL points, or six ADL points -- in each case, falling one point short of the number that would bump the patient into one of the higher RUG categories -- Extendicare management would instruct the FRC or CRC to speak with the CNAs to see whether, based on services that had been provided, they could simply "find" another ADL point.

81.   As an example of this practice of trying to "find" another ADL point, consider the case of Patient 9 at Elkins Crest in September 2009. In the pathway review, Extendicare

33

administrators noted that his ADL score for the 5-day assessment was 15 -- just one point short of the 16 necessary for a higher level of reimbursement, at a cost impact of $317.66. The pathway review comment was: "ADL score is 15.  CRC is to review for additional ADL point." (Exhibit 9.)

        B.      Denying Medically Necessary Services to Medicare Part A Patients

      82.     The evidence demonstrates that, just as Extendicare aggressively pushes therapists to ramp up and provide unnecessary therapy during the assessment periods for the purpose of maximizing reimbursement, Extendicare also pushes therapists to ramp down therapy minutes after the assessment reference dates, and not to "over-provide" therapy minutes, *i.e.*, not to provide substantially more minutes than are necessary to qualify the patient for any RUG category.  As a result of this practice, Extendicare is also defrauding the U.S. government in many instances by failing to provide medically necessary services that Medicare is paying for. *See* 42 C.F.R. § 483.25 (facilities must provide patients with "the necessary care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being, in accordance with the comprehensive assessment and plan of care"); 42 C.F.R. § 483.45 (a facility must either provide the care mandated by the patient's comprehensive plan of care or obtain the services for the patient from an outside resource).  By withholding therapy services that are medically necessary, Extendicare minimizes its costs and, in some cases, gets additional reimbursement by increasing the length of the patient's stay.

      83.     Once a targeted RUG level is obtained, Extendicare's clinical reimbursement staff instructs the therapy staff to "ramp down" the level of therapy below the RUG level then being billed.  For example, the Elkins pathway review report on February 18, 2009, has a note for Patient 10 saying that the FRC was "educated to ramp down to RV after 30 day [assessment

review date]." (Exhibit 10.) Another note in the Elkins pathway review report for April 15, 2009 states that, for Patient 11, "Obtained RU at 30d now ramping down." (Exhibit 11.) As a result of this practice of ramping down, those patients who are *correctly* classified in the higher RUG levels often do not receive the full extent of therapy that is medically necessary to restore them to health and has been paid for by Medicare Part A.

84.     Another pathway review note criticizes the Dresher facility for "overproviding" minutes to a patient because the therapy minutes exceeded the *minimum* amount of minutes expected in the patient's RUG category. Patient 12 had qualified for the RV level of reimbursement, *i.e.*, the patient needed between 500 and 719 therapy minutes per week. In this instance, the facility was providing 623 minutes of therapy to Patient 12 for a one-week period -- almost exactly in the middle of the range expected for an "RV" patient. However, the pathway review note dated August 12, 2009, states that the Dresher facility "overprovided RV minutes (623)." (Exhibit 12.)

C.     Denying Medically Necessary Services to Medicare Advantage Patients

85.     Many of the patients in Extendicare facilities are covered by one of the managed care plans offered under Medicare Advantage. In a managed care situation, health care providers generally receive the same amount of money per patient regardless of the level of care provided; accordingly, a provider can make more money by providing less care.

86.     A Medicare Advantage patient who requires rehabilitation services and who is admitted to an Extendicare SNF following a hospitalization is entitled to receive whatever services are medically necessary, subject to any limits in the contract between Extendicare and the managed care insurance provider. Often, these contracts provide that patients shall receive all medically necessary therapy services, up to five hours (300 minutes) of therapy per week.

35

87.     Despite the patient's entitlement to the level of therapy specified in the patient's managed care contract, Extendicare has internal agreements with ProStep, the Extendicare division that actually provides the therapy, requiring ProStep to limit the amount of therapy provided to Medicare Advantage enrollees to levels below those specified in the Medicare Advantage managed care contract. These internal agreements, known as "Ready References," are published on the company's intranet. Extendicare does not establish similar limits on the amount of therapy to be provided to beneficiaries of traditional Medicare Part A; this limitation is aimed specifically at Medicare managed care enrollees, and based solely on financial considerations. Consequently, Medicare patients with similar conditions and diagnoses often receive significantly disparate treatment at Extendicare facilities, depending solely on whether the patients are covered by traditional Medicare Part A or a Medicare Advantage plan.

88.     Extendicare requires its FRCs to check these Ready References and, in accordance with them, limit the amount of therapy provided to managed care patients. Frequently, although the Extendicare contract with the Medicare Advantage provider states that patients can receive up to five hours of therapy per week, Extendicare will limit the therapy to 30 minutes per day for a maximum of five sessions per week, *i.e.*, a total of two-and-a-half hours of therapy per week.

89.     For example, in November 2008, the FRC at the Extendicare's Oak Hill facility wanted to provide 60-65 minutes of therapy per day to a resident who was covered by the Unison Advantage Level 1 (Medicare) plan, as provided in Extendicare's Unison Advantage contract (which provided for "less than 5 hours of therapy a week"). Upon learning this, on November 21, 2008, Extendicare's Eastern Operations Area Vice-President Jan Ricchio sent the FRC the following e-mail: "The contract says 'less than 5 hours of therapy a week'. EHSI has agreed to

36

pay prostep for a minimum of 15 minutes and a maximum of 30 minutes per day for 5 days on those contracts. You are providing between 300 and 325 rather than between 75 and 150?" (Exhibit 13.)

90. In other words, where there was a conflict between what was set forth in the managed care contract and the EHSI/ProStep "agreed upon limits per contract as listed on the intranet," the EHSI/ProStep limits would govern even if the patient was denied medically necessary care. And, in those situations, Extendicare's Medicare Advantage patients would not receive the level of therapy that the U.S. government paid for under the managed care contracts.

D.      Upcoding Medicaid RUG Classifications by Clustering Therapy

91. Extendicare also upcoded the RUG classifications for patients whose stays in the facilities were covered by Medicaid, with at least some of the costs of their therapy reimbursed under Medicare Part B. Although Medicaid generally pays much lower reimbursements than Medicare Part A, it is still a steady source of income for Extendicare facilities, enabling Extendicare to generate income by filling beds that otherwise might go empty. Medicaid pays higher amounts when patients are receiving therapy at least on a five-times-per-week basis for at least 150 minutes in total (sometimes referred to as "5/150"). However, Extendicare does not want to provide Medicaid patients with more than three therapy sessions a week, for three reasons. First, Extendicare does not consider this a profitable use of its therapists, who can usually generate more revenue by providing therapy to Medicare Part A patients. Second, if a Medicaid patient has recently completed his course of skilled services covered by Medicare Part A and Extendicare provides the patient with five sessions of therapy per week, this is considered to be a skilled level of service that interrupts the patient's 60-day wellness period, which means the patient will have to re-start the 60-day period before again being eligible for benefits under

Medicare Part A. And third, Extendicare's internal agreement with ProStep stipulates that, for patients who are not covered by Medicare Part A, EHSI will "pay" ProStep at the rate of one dollar per therapy minute delivered. Thus, whenever ProStep provides a minute of therapy to a Medicaid patient, EHSI incurs a "cost" of one dollar and therefore appears less profitable.

92. Despite the fact that Extendicare was providing Medicaid patients with only three therapy sessions a week, and the doctors' orders specified that the patients were to receive only three weekly sessions, Extendicare was clustering these three sessions around the weekend so that a patient could have five sessions within a seven-day period. Extendicare was then representing to Medicaid that these patients were receiving therapy five days per week and, on this basis, submitting claims to Medicaid for higher reimbursement amounts. In an e-mail to Ms. Lovvorn on September 4, 2009, referring to the Spruce Manor Nursing and Rehabilitation facility in West Reading, Pennsylvania, Wanda Kennedy, Eastern Operations Area Director of Clinical Reimbursement, specifically encouraged this practice, saying: "At Spruce, the process was for the FRC to collaborate with the BOM [business office manager] when picking up a resident to identify where the resident was in the 60 day break in stay. (Spruce recycles a large number of their residents.) If appropriate the resident would be provided treatment at 3x per week vs. 5x a week because at 3x per week, the 60 day break in stay would not be reset. At 3x per week we can still do 3 days and 2 days to get the 5/150." (Exhibit 14.) As noted earlier, the "5/150" referred to the numbers necessary to qualify for higher Medicaid reimbursement.

E.      Denying Medically Necessary Treatment for Medicaid Patients

93.     For Extendicare patients who are covered by Medicaid and Medicare Part B, the manner in which they begin any necessary rehabilitation services is different from Medicare A patients, because most of the Medicaid/Medicare B patients are already residing in the facility as LTC residents when therapy services begin.  When a resident is identified as requiring therapy services, before the services will be provided, the FRC must notify the business office manager and the clinical reimbursement staff and request permission from the Facility Administrator.  The Facility Administrator and Extendicare's Regional Director of Operations then have to "approve" the services before therapy can be commenced.

94.     Despite the fact that Extendicare may be representing to Medicaid that some of these patients are receiving therapy on a five-times-per-week basis -- and these patients in fact need that much therapy, and Medicaid is paying for that level of service -- Extendicare puts enormous pressure on the facility not to provide therapy more than three times per week.  As stated above, one reason for this is that it would interrupt the 60-day wellness period and thus delay the patient's eligibility for a new round of benefits under Medicare Part A; a second reason is that Medicaid and Medicare Part B don't pay very much; and a third is that EHSI must "pay" ProStep for the therapy minutes, hurting EHSI's "bottom line."  Ironically, at the same time Extendicare is trying to minimize the therapy actually provided to Medicaid patients, administrators are trying to cluster whatever therapy treatment is provided in order to maximize Medicaid reimbursement.

95.     An example of a situation where a Medicaid/Medicare Part B patient needed therapy on a five-times-per-week basis, but an Extendicare administrator sought to limit the amount of therapy to three times a week, occurred at Extendicare's Statesman Health and

Rehabilitation Center in mid-August 2009. The patient had just suffered a stroke, and the therapists demonstrated that it was medically necessary for him to receive therapy on a five-times-per-week basis. An Extendicare administrator, Patti Robinson, said in response, "5 times is too much. Can we do 3." (Exhibit 15.) In this instance, several days after the initial request for increased therapy, the therapists apparently succeeded in overriding the normal company policy.

### THE NATIONWIDE SCOPE OF THE FRAUDULENT CONDUCT

96.     During the course of her employment, Ms. Lovvorn uncovered evidence that Extendicare is engaging in the fraudulent schemes described herein not only in the Eastern Region where Ms. Lovvorn was working, but also throughout Extendicare's entire operational area, *i.e.*, on a nationwide basis. This evidence includes an internal report called "Key Stats" that is prepared and maintained by the accounting department in Extendicare's Milwaukee, Wisconsin corporate office. (Exhibit 16.) The report, which was distributed to managers including Ms. Lovvorn, tracks various key indicators concerning Extendicare's nationwide operations. Among the indicators that Extendicare tracks for each of its operational areas (*i.e.*, regions or states) are the percentage of Part A patients Extendicare classifies in each of the RUG categories, and the average minutes Extendicare provides to patients at each of the various RUG levels. As evidenced in the 2009 Key Stats report, in every state and region in which it operates, Extendicare is pushing a growing percentage of patients into the two highest RUG categories, while at the same time it is consistently providing far fewer therapy minutes than required to justify these RUG levels.

97.     For example, in the Pennsylvania/Delaware regions, in November 2009, Extendicare classified 67.29% of its Part A Medicare patients in the "RU" or "RV" categories.

During that same time, however, Extendicare's Pennsylvania/Delaware facilities provided an average of 80.87 minutes per day for patients who were categorized as "RU," and an average of 47.83 minutes per day for patients who were categorized as "RV." However, pursuant to the RUG coding system, RU patients are those who receive at least 720 minutes of therapy per week, or approximately 102.86 minutes per day, and RV patients are those who receive at least 500 minutes of therapy per week, or approximately 71.42 minutes per day. In other words, in the Pennsylvania/Delaware region, Extendicare is providing less than 80% of the therapy that RU patients should receive and less than 67% of the therapy that RV patients should receive. The situation is even worse for RU patients in the Ohio region, where, in November 2009, Extendicare provided an average of only 70.86 minutes of therapy per day to RU patients.

    98.    Another place where Extendicare's fraud is particularly egregious is in the State of Michigan. Having purchased some ongoing facilities, Extendicare commenced rehabilitation operations in Michigan in April 2009. As of April 2009, 44.62% of the Medicare patients at Extendicare facilities in Michigan were classified as RU, and the average number of therapy minutes provided to these patients was 98.53 minutes per day -- approximately 96% of the minutes one might expect, using the figure of 102.86 minutes as a daily minimum. Throughout the remainder of 2009, however, the percentage of RU patients climbed rapidly, while over the same time period, the average number of therapy minutes provided to RU patients declined precipitously. By November 2009, the percentage of Medicare patients classified as RU in Extendicare's Michigan facilities had risen to 55.58%, while the average number of minutes of therapy provided to the RU patients had fallen to 85.04 minutes per day -- less than 83% of the minutes one might expect, based on the minimum level of 102.86 minutes per day. (*See* Exhibit 16: 2009 Key Stats: Michigan.)

41

99.     Ms. Lovvorn received further confirmation that Extendicare is engaged in a scheme to defraud Medicare and Medicaid at all its facilities throughout the United States when she attended a budgeting training session for all Area Rehabilitation Directors in August 2009 at Extendicare's corporate offices in Milwaukee, Wisconsin.   During this meeting, Extendicare's corporate management explained that Extendicare keeps track of the breakdown of the RUG categories in which its Medicare Part A patients are placed at each of its facilities.   Thus, Extendicare knows how many therapy minutes it needs to provide -- and, based on the average productivity of its therapists, how many therapists it needs to employ -- in order to provide the minimum amount of therapy that would be "expected" for the patients in the various RUG categories.   However, Extendicare informed Ms. Lovvorn and the other Area Rehabilitation Directors that instead of hiring enough therapists to provide the minimum minutes that the patients should be receiving if their classifications accurately reflected their medical needs, Extendicare budgets for at least 10 percent fewer treatment minutes than would be necessary to provide the minimum amount of therapy that is billed for the Part A rehabilitation patients.

100.     Ms. Lovvorn also learned during the course of her employment that two of the primary tools through which Extendicare pressures FRCs, therapists, and others to improperly maximize reimbursement -- the use of resident pathways and pathway review calls -- are not confined to the Eastern Region. Rather, Extendicare has had a company-wide policy requiring facilities in every region to generate resident pathways and participate in pathway review calls. (Exhibits 17 and 18.)

42

## DEFENDANTS' RETALIATORY DISCHARGE OF MS. LOVVORN

101.    When Ms. Lovvorn was hired by Extendicare in October 2008, she was successful in her role as ADR despite the significant challenges that she inherited upon taking the position. By September 2009, she had reduced the number of open therapist positions in her area from 42 to 16, cut Extendicare's reliance on costly contract therapists by 50%, and improved her facilities' performance as measured by several operations indicators, including therapy team productivity. This resulted in an October 2009 profit margin of 10.89%, well above the 7.12% Extendicare had budgeted. Ms. Lovvorn's supervisor, ProStep Vice President Sharon Gawronski, acknowledged her exemplary performance when she described Ms. Lovvorn, in her annual performance review for 2009, as a "loyal and dedicated leader for ProStep" who had "clearly caught on well to the ADR role and ... become a proven leader as it relates to the operations of the job."

102.    Initially, Ms. Lovvorn also forged a positive working relationship with Jan Ricchio, the Eastern Operations Area Vice President for Extendicare, who oversaw management of the 21 facilities where Ms. Lovvorn's ProStep staff provided rehabilitation services. As EHSI's Vice President of Eastern Operations and ProStep's primary internal customer in the Eastern Area, Ms. Ricchio wielded a great deal of control over the ADR position. This relationship was well known among EHSI staff to have been strained in the past, so much so that in the two years prior to Ms. Lovvorn's arrival, ProStep had cycled through two other ADRs for the Eastern Area.

103.    Ms. Lovvorn was able to turn this situation around within a few months. By March 2009, at an Eastern Area meeting in Grantville, Pennsylvania, Ms. Ricchio commented to Extendicare CEO Tim Lukenda and ProStep VP Sharon Gawronsky that her relationship with

43

Ms. Lovvorn was "a good one." She added, speaking of Ms. Lovvorn, "We definitely found the right one!" At an annual ProStep awards luncheon the following month, she commended Ms. Lovvorn's ProStep leadership and credited ProStep for much of Extendicare's success in the Eastern Area. However, the working relationship between Mr. Lovvorn and Ms. Ricchio changed when, starting in August 2009, Ms. Lovvorn began to complain internally, both orally and in writing, of Extendicare's fraudulent billing practices.

104.    When Ms. Lovvorn first complained internally on August 13, 2009, about Extendicare's fraudulent billing practices, Ms. Ricchio and Ms. Kennedy became visibly upset and even angry, denied that Ms. Lovvorn's concerns were valid, and refused to discuss the matter further. After this discussion, Extendicare immediately began to retaliate against Ms. Lovvorn. The following day, Friday, August 14, 2009, Ms. Ricchio sent Ms. Lovvorn an accusatory email, with a copy to Ms. Kennedy, attacking her performance in connection with the Slate Belt facility, which was beset with budget problems. Ms. Ricchio's criticisms were unfounded and she knew it: just the day before, Ms. Lovvorn had gone over the budget problems with Ms. Ricchio and demonstrated that neither the FRC nor any other ProStep employee was responsible for the budget problems. Ms. Ricchio had no basis for her criticisms, but rather was lashing out at Ms. Lovvorn in order to punish and discredit her because she had raised concerns about fraudulent billing practices.

105.    Ms. Ricchio sent additional accusatory emails to Ms. Lovvorn on Monday, August 17, 2009. The following day, concerned that Ms. Ricchio planned to have her terminated, Ms. Lovvorn met briefly with Extendicare's Director of Human Resources Tim Detary, notifying him of Extendicare's Medicare billing practices and of Ms. Ricchio's retaliation against her. Ms. Ricchio, who was in Milwaukee at the time, witnessed Ms. Lovvorn

44

meeting with Mr. Detary. The next day, at Mr. Detary's request and with the support of Ms. Gawronski, who was her supervisor, Ms. Lovvorn met formally with Mr. Detary and Ms. Gawronski and laid out in detail her concerns about the Medicare billing practices she had investigated. Throughout this meeting, Ms. Lovvorn repeatedly described Extendicare's billing practices as fraudulent and illegal, and she suggested that Extendicare's compliance office should investigate. Mr. Detary and Ms. Gawronski agreed that Ms. Lovvorn's concerns were valid ones. At the end of the meeting, Mr. Detary assured Ms. Lovvorn that they would report her concerns to corporate compliance for investigation.

106.    Knowing that Ms. Lovvorn had elevated her complaints, Ms. Ricchio immediately escalated her retaliatory campaign against Ms. Lovvorn. On August 20, 2009, for example, she undermined Ms. Lovvorn's authority among ProStep staff by directly contacting the FRC at Valley Manor, and directing her to work at a different facility. On that same day, Ms. Ricchio sent an email to Ms. Lovvorn and Extendicare's top regional managers implying that Ms. Lovvorn was not able to fulfill her job duties. Coming from ProStep's internal customer and the highest-level Extendicare official in Ms. Lovvorn's area, this unwarranted interference and false criticism undercut Ms. Lovvorn's authority and reputation among Extendicare's management and staff.

107.    On August 31, 2009, almost two weeks after Ms. Lovvorn first reported her concerns regarding fraudulent billing to Mr. Detary and Ms. Gawronski, Extendicare Corporate Compliance Officer Donna Maasen interviewed Ms. Lovvorn telephonically about her complaints. Ms. Lovvorn told Ms. Maasen that Extendicare was fraudulently and illegally billing Medicare, and explained in detail the way Extendicare was engaging in suspension bridge billing and improperly clustering therapy sessions.

108.     In the middle of the compliance investigation, the newly appointed FRC at Dresher Hill abruptly stepped down from his position.  This individual was one of the co-FRCs whom Ms. Lovvorn had interviewed early on in her investigation, and who had expressed serious reservations about Extendicare's billing practices.  Based on these discussions, Ms. Lovvorn believes this co-FRC resigned, in part, because he was unwilling to engage in the fraudulent and clinically reckless billing practices required by Ms. Ricchio and the clinical reimbursement staff.

109.     Ms. Ricchio continued barraging Ms. Lovvorn with false criticisms. On September 9, for example, after speaking with the departing RDR and hearing that he was resigning because of his concerns about billing improprieties, Ms. Ricchio sent an email to EHSI's regional leadership accusing Ms. Lovvorn and the former RDR of having been untruthful with her about a hiring matter.  Ms. Lovvorn reported this retaliatory harassment to Mr. Detary on September 10, 2009, but he took no action to protect her.

110.     On September 22, 2009, Mr. Detary, Ms. Gawronski, and corporate compliance officer Donna Maasen reported the outcome of Extendicare's investigation to Ms. Lovvorn in a meeting at the corporate office in Milwaukee.  According to Ms. Maasen, she had interviewed two Eastern-Area RDRs, three FRCs, and some of Ms. Ricchio's staff, and had found no evidence that "all" patients in Ms. Ricchio's operations area were categorized at the RU level. However, Ms. Lovvorn had never asserted that EHSI was billing *all* patients at the RU rate; she had charged, correctly, that the company was billing at various RUG levels that were higher than the services it provided to patients or than were medically needed, and that Extendicare management wanted facilities to *presume* upon a patient's admission that the patient could be scheduled for rehabilitation therapy at the RU level.  Ms. Lovvorn had repeatedly explained that the problem was not just billing patients at the RU level when they should have been billed at the

46

RV level, but also, billing other patients at the RV level when they should have been billed at the RH level.

111.    By intentionally mischaracterizing Ms. Lovvorn's complaint, Extendicare deliberately ignored and refused to investigate the widespread billing fraud she had reported. When Ms. Lovvorn asked if the investigation had examined the glaring pattern in the resident pathways of ramping up therapy minutes during assessment periods and then drastically decreasing them during non-assessment periods, Ms. Maasen indicated that the investigation had found no evidence of such a practice, and claimed that it was "typical" for the number of minutes of therapy actually provided not to match up exactly with the minutes projected during assessment periods. According to Ms. Maasen's characterization of the non-findings of the investigation, it was as though the company had found nothing wrong whatsoever.

112.    Despite her cryptic description of the investigation's findings, Ms. Maasen informed Ms. Lovvorn that Extendicare would be implementing some company-wide recommendations as a result of the investigation. Ms. Maasen provided Ms. Lovvorn with a list of these measures, some of which belied Ms. Maasen's description of the findings of the investigation.

113.    Extendicare's plans for addressing Ms. Ricchio's harassment of Ms. Lovvorn were similarly disappointing. When the discussion turned to this topic, Mr. Detary indicated that Extendicare had no intention of stopping Ms. Ricchio's unlawful campaign of retaliation against her. The company knew that Ms. Ricchio was bullying her, Mr. Detary acknowledged, but he warned Ms. Lovvorn that if she wanted a future at Extendicare she would just have to learn how to live with Ms. Ricchio. This and Mr. Detary's other comments made it clear that Ms.

Lovvorn's job was in jeopardy, and that the company would no longer tolerate her insistence on compliance with Medicare rules and regulations.

114.    Not surprisingly in light of Mr. Detary's statements, Ms. Ricchio sent another flurry of harassing and accusatory emails to Ms. Lovvorn on Friday, September 25, 2009, and into the following morning. In these emails, Ms. Ricchio badgered Ms. Lovvorn relentlessly, claiming that she was slacking on her job and forcing others to perform her job duties, and implying that she was lying in her rebuttals.  Ms. Ricchio also indicated that her criticisms were "non-negotiable" and that it was "immaterial" whether Ms. Lovvorn agreed.  Fearful that Ms. Ricchio intended to have her terminated, Ms. Lovvorn responded by filing a formal complaint of retaliation and harassment with Extendicare's Human Resources and Corporate Compliance offices, as well as with her direct supervisor, Ms. Gawronski.  In this complaint, Ms. Lovvorn stated that Ms. Ricchio continued to create a hostile employment environment for her because she had reported the improper billing practices of Ms. Ricchio and her staff.  Ms. Lovvorn also pointed out that the False Claims Act protected her from retaliation based on her complaint, and she reiterated her concern that the billing practices identified in her initial complaint continued. Despite this formal complaint, Ms. Ricchio continued to harass Ms. Lovvorn by email throughout the day on Monday, September 28, 2009, asking her questions such as, "Can I ask where you were on Friday?" and again accusing her of falling down on the job and lying to cover her so-called dereliction of duty.

115.    Also on September 28, 2009, Extendicare suddenly announced Ms. Gawronski's resignation, effective immediately.  Ms. Gawronski's resignation left Ms. Lovvorn even more vulnerable to Ms. Ricchio's retaliation, as Ms. Gawronski had direct knowledge of Ms. Lovvorn's exemplary performance and of the falsity of Ms. Ricchio's accusations and had

provided some level of protection for Ms. Lovvorn. Even worse, Extendicare appointed Rick Gurka as the new Vice President of ProStep, which made him Ms. Lovvorn's direct supervisor. Mr. Gurka was also Extendicare's Vice President of Clinical Reimbursement and was thus in charge of the reimbursement staff who had helped lead the problematic pathway calls, drafted the inappropriate "missed opportunity" reports, and forced FRCs to engage in unlawful billing practices. It was thus no surprise that when Mr. Gurka and Mr. Detary spoke with Ms. Lovvorn about her formal complaint against Ms. Ricchio, Mr. Gurka summarily dismissed Ms. Lovvorn's complaint and told her that she needed to learn to communicate better with Ms. Ricchio. Mr. Gurka thus sought to shift the blame for Ms. Ricchio's retaliation and harassment to Ms. Lovvorn and refused to commit to protecting her against further retaliation.

116. Ms. Ricchio's retaliation, the sudden departure of Ms. Gawronski, Mr. Gurka's and Mr. Detary's refusal to protect Ms. Lovvern, and Ms. Lovvorn's reasonable fear that she faced likely termination resulted in her suffering acute stress and anxiety in late September 2009. On October 2, short of breath and feeling chest pains, Ms. Lovvorn was admitted to a hospital for overnight observation. Her doctor prescribed an anti-anxiety medication and recommended that she take two to three weeks of medical leave, which she began on October 6, 2009.

117. Upon her return to work on October 26, 2009, Ms. Lovvorn found that Extendicare had not corrected the fraudulent billing practices she had reported. She spoke to one of her colleagues, who had been serving as a treating therapist for two months, and he confirmed that Ms. Ricchio and the clinical reimbursement staff continued to pressure facilities' staff to ramp up therapy minutes during assessment periods and to cluster therapy days in order to meet higher RUG levels. It was clear to Ms. Lovvorn that Extendicare had deliberately chosen to

ignore the fraudulent practices, effectively encouraging Ms. Ricchio and the clinical

reimbursement staff in their efforts to boost revenues at the expense of taxpayers and patients.

118.    A few days later, it also became clear that the company intended to "shoot the

messenger" who had reported the unlawful activities that continued unabated.  On October 29,

2009, Joy Koolloos, whom Mr. Gurka had installed as Director of Operations for ProStep and

Ms. Lovvorn's direct supervisor, issued Ms. Lovvorn a written reprimand containing a laundry

list of supposed performance deficiencies.  The list repeated some of Ms. Ricchio's false

criticisms and added new ones, all of which were either unfounded or inappropriate given the

fact that Ms. Lovvorn had been operating with a reduced staff for some time.  The only

conceivable purpose of the reprimand was to create a paper trail to support her termination.

Before Ms. Lovvorn could respond, however, she was in a serious car accident causing her to be

hospitalized and forcing her to take medical leave from October 30 to November 9, 2009.

119.    Soon after returning to work on November 9, 2009, Ms. Lovvorn participated in a

conference call with Mr. Gurka, Ms. Koolloos and Ms. Ricchio.  During that call, it came up that

a physical therapist at the Slate Belt facility had resigned her position during Ms. Lovvorn's

absence.  In the discussion that followed, Ms. Lovvorn pointed out that this was the same

therapist who had approached Ms. Lovvorn during the summer and expressed serious

reservations about EHSI's Medicare billing practices and its focus on revenues in what she

believed was a disregard for the clinical needs of patients.  Ms. Lovvorn also pointed out that this

therapist had worked in the facility whose FRC had been criticized by Ms. Ricchio in an August

13 email for "listening to the therapists when planning the patient's levels," and had failed to

consistently schedule patients at the highest possible level.  Ms. Lovvorn also expressed her

concern that three months of pathway calls may have succeeded in forcing the FRC to yield to

50

Extendicare's pressure to schedule for the highest RUG level and not the patient's needs. In addition, Ms. Lovvorn mentioned that the FRC at a facility called Arbors of New Castle, Delaware, had recently raised concerns about orders not to provide five-days-a-week treatment that was needed by LTC residents because that would interrupt the 60-day "wellness period," and to cluster therapy in order to make it appear that patients were receiving therapy five days a week when, in fact, they were receiving it only three days a week. All of this, Ms. Lovvorn stated on the call, indicated that the fraudulent practices she had reported starting in August were ongoing and had not been corrected. The only response from Mr. Gurka, Ms. Koolloos, and Ms. Ricchio was that it sounded like there was a need for educating Extendicare staff regarding billing compliance. When Ms. Lovvorn asked when this education would begin, no one responded with a concrete plan to begin the education process.

120.    On November 11, 2009, Ms. Lovvorn attended a clinical reimbursement meeting at the Stonebridge facility. The meeting was also attended by Ms. Kennedy, four management-level clinical reimbursement staff members, and another person who was Ms. Lovvorn's direct report. Having heard from her superiors two days earlier that Extendicare staff needed further education on billing compliance, Ms. Lovvorn decided to begin that process at the Stonebridge meeting. The occasion was particularly appropriate because the attendees included both clinical reimbursement and therapy staff, and because all attendees were managers who could disseminate compliance information to their own staffs.

121.    After discussion of other business had ended at the meeting, Ms. Lovvorn told the attendees that she and her staff had witnessed several billing practices that raised questions about Extendicare's compliance with Medicare rules and regulations. She specifically cited the "ramping up" of therapy minutes to higher RUG levels during assessment periods and the

51

clustering of therapy sessions to overbill for RUG levels that required therapy on five of seven days. She explained the problems with these practices in detail, made clear what was and was not compliant, and ended her presentation by encouraging the group to work together to ensure that Extendicare operated profitably, lawfully, and in the best interests of its patients. Providing this type of education to Extendicare staff was part of the job responsibilities of her position.

122.    The next day, on November 12, 2009, Ms. Lovvorn received an instruction to telephone Mr. Gurka at Extendicare's corporate headquarters in Milwaukee. When she phoned in to the call, which included Mr. Gurka, Ms. Koolloos and Mr. Detary on the line, Mr. Detary informed her that the company was suspending her employment pending an "investigation" into her conduct at the previous day's meeting at Stonebridge. According to Mr. Detary, Ms. Lovvorn had acted inappropriately when she informed the participants of her concerns regarding Extendicare's billing practices, and by raising concerns among these employees that they might not be in compliance with the law. Initiating such a discussion, Mr. Detary scolded her, was outside the scope of her responsibilities and was unacceptable.

123.    In fact, Ms. Lovvorn was acting well within the scope of her duties. Her ADR job description specifically charged her with "ensuring that all therapy services are in accordance with [Extendicare] policies and procedures and *in compliance with state and federal regulations*" (emphasis added). She was also carrying out what she had heard from Mr. Gurka, Ms. Koolloos, and Ms. Ricchio just days earlier – that is, that Extendicare needed to better educate its employees on compliance issues. Ms. Lovvorn was simply doing her job, and nothing about her presentation was inappropriate or grounds for suspension. Mr. Detary suspended Ms. Lovvorn because she had refused to allow Extendicare to sweep her valid reports of fraudulent billing practices under the rug.

124. During the November 12 call, Ms. Lovvorn was requested to provide a written description of her actions and to follow up with Donna Maasen in regards to her continuing compliance concerns. In response, the following day, Ms. Lovvorn sent an e-mail to Mr. Gurka, Ms. Koolloos, Mr. Detary, and Ms. Maassen. In the e-mail, Ms. Lovvorn denied that she had done anything wrong and attached two items: an account of what happened at the November 11 meeting at Stonebridge (Exhibit 19), and a brief summary of the compliance concerns she had previously expressed. (Exhibit 20).

125. On November 16, 2009, Mr. Detary and Mr. Gurka telephoned Ms. Lovvorn and terminated her employment, saying that the decision was based on their investigation of the presentation she had given on November 11. The only other reason they gave her was that the company had decided to exercise what Mr. Detary called its "at-will employment option" and to part ways with her.

## Count I: Knowingly Presenting False Claims
### (31 U.S.C. § 3729(a)(1) (2008), § 3729(a)(1)(A) (2009)

126. Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 125, as if fully set forth herein. This Count is a civil action against all Defendants for violating 31 U.S.C. § 3729(a)(1) (2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(A) (2009).

127. Defendants have knowingly presented, or caused to be presented, false claims for payment to officials or employees of the United States Government.

128. Because of the Defendants' conduct under this Count, the United States has suffered actual damages of at least $10 million.

53

### Count II: False Records or Statements
### (31 U.S.C. § 3729(a)(2) (2008), § 3729(a)(1)(B) (2009))

129.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1

through 128 as if fully set forth herein. This Count is a civil action against all Defendants for

violating 31 U.S.C. § 3729(a)(2)(2008) or, alternatively, 31 U.S.C. § 3729(a)(1)(B)(2009).

130.    Defendants have knowingly made or used, or caused to be made or used, false

statements for the purpose of getting false or fraudulent claims paid or approved by the

Government. Defendants have made or used these false statements, or caused them to be made

or used, with the specific intent to get paid by the United States Government.

131.    Because of the Defendants' conduct under this Count, the United States has

suffered actual damages of at least $10 million.


### Count III: Improperly Failing to Repay Money Owed to the United States
### (31 U.S.C. § 3729(a)(1)(G)  (2009))

132.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1

through 131 as if fully set forth herein. This Count is a civil action against all Defendants for

violating 31 U.S.C. § 3729(a)(1)(G)(2009).

133.    Defendants have knowingly made, used, or caused to be made or used, false

records or statements material to an obligation to pay or transmit money or property to the

United States Government.

134.    Defendants have knowingly concealed, or knowingly and improperly avoided or

decreased, an obligation to pay or transmit money to the United States Government.

135.    Because of the Defendants' conduct under this Count, the United States has

suffered actual damages of at least $10 million.

### Count IV: Delaware False Claims Act
(6 Del. C. § 1201, *et seq.*)

136.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 135, as if fully set forth herein.  This Count is a civil action against all Defendants for violating the Delaware False Claims and Reporting Act, 6 Del. C. § 1201, *et seq.*

137.    Defendants have knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Delaware.  Defendants have also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Delaware.

138.    Because of the Defendants' conduct, the State of Delaware has been damaged.

### Count V: Indiana False Claims Act
(Ind. Code. § 5-11-5.5-1, *et seq.*)

139.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 138, as if fully set forth herein.  This Count is a civil action against all Defendants for violating the Indiana False Claims & Whistleblower Protections Law, Ind. Code § 5-11-5.5-1, *et seq.*

140.    Defendants have knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Indiana.  Defendants have also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Indiana.

141.    Because of the Defendants' conduct, the State of Indiana has been damaged.

### Count VI: Michigan False Claims Act
(Mich. Code 400.601 *et seq.*)

142.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 141, as if fully set forth herein.  This Count is a civil action against all Defendants for violating the Medicaid False Claims Act, Mich. Code 400.601 *et seq.*

143.    Defendants have knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Michigan.  Defendants have also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Michigan.

144.    Because of the Defendants' conduct, the State of Michigan has been damaged.

### Count VII: Minnesota False Claims Act
(Minn. Stat. § 15C.01 *et seq.*)

145.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 144, as if fully set forth herein.  This Count is a civil action against all Defendants for violating the Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*

146.    Defendants have knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Minnesota.  Defendants have also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Minnesota.

147.    Because of the Defendants' conduct, the State of Minnesota has been damaged.

## Count VIII: Wisconsin False Claims For Medical Assistance Act
### (Wis. Stat. § 20.931 *et seq*.)

148.    Plaintiff re-alleges and incorporates the allegations in paragraphs 1 through 147, as if fully set forth herein. This Count is a civil action against all Defendants for violating Wisconsin False Claims For Medical Assistance Act, Wis. Stat. §20.931 *et seq*.

149.    Defendants have knowingly presented, or caused to be presented, false Medicaid claims for payment to officials or employees of the State of Wisconsin. Defendants have also knowingly made or used, or caused to be made or used, false statements for the purpose, and with the specific intent, of getting false or fraudulent Medicaid claims paid or approved by the State of Wisconsin.

150.    Because of the Defendants' conduct, the State of Wisconsin has been damaged.

## Count IX: False Claims Act Anti-Retaliation Provision
### (31 U.S.C. § 3730(h) (2009))

151.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 150 as if fully set forth herein. This Count is a civil action against all Defendants for violating the anti-retaliation provision of the False Claims Act, 31 U.S.C. § 3730(h) (2009).

152.    During the course of her employment, Plaintiff investigated numerous instances where she reasonably believed that Defendants were violating the False Claims Act. Plaintiff made numerous reports to her supervisors and other Extendicare officials regarding Defendants' fraudulent conduct and violations of the False Claims Act, including filing an official written complaint citing the False Claims Act and reasserting her belief that Defendants were engaging in fraudulently billing practices. Plaintiff also repeatedly attempted to stop Defendants'

57

violations of the False Claims Act, including by educating Defendants' staff about the specific fraudulent billing practices and how to avoid engaging in them.

153.    Defendants were aware that Plaintiff had engaged in activities in furtherance of a potential action under the *qui tam* provisions of the False Claims Act.  Defendants were also aware of Plaintiff's efforts to stop violations of the False Claims Act.

154.    Because Plaintiff was engaged in activities that are protected under the False Claim Act's anti-retaliation provision, 31 U.S.C. § 3730(h), Defendants repeatedly retaliated against Plaintiff, culminating in their termination of Plaintiff's employment.  Upon Plaintiff's reports of Defendants' fraudulent conduct, Defendants began severely harassing Plaintiff, conduct that continued through the end of Plaintiff's employment.  When Plaintiff continued to attempt to stop Defendants' fraudulent conduct, Defendants' suspended her employment and then terminated her.

155.    As a direct and proximate result of the foregoing, Plaintiff has lost the benefit and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to her career.  Plaintiff is entitled to all relief necessary to make her whole.

### Count X: Wisconsin False Claims For Medical Assistance Act
### Anti-Retaliation Provisions
(Wis. Stat. § 20.931(14)

156.    Plaintiff re-alleges and incorporates the allegations contained in paragraphs 1 through 155 as if fully set forth herein.  This Count is a civil action against all Defendants for violating the anti-retaliation provision of the Wisconsin False Claims for Medical Assistance Act, Wis. Stat. § 20.931(14).

157.    During the course of her employment, Plaintiff repeatedly took actions in furtherance of an action or claim filed under the Wisconsin False Claims for Medical Assistance Act. Plaintiff investigating numerous instances where she reasonably believed that Defendants were fraudulently billing an officer, employee or agent of the State of Wisconsin in violation of the Wisconsin False Claims for Medical Assistance Act. Plaintiff made numerous reports to her supervisors and other Extendicare officials regarding Defendants' fraudulent billing practices, including filing an official written complaint that asserted her belief that Defendants were engaging in fraudulently billing practices. Plaintiff also repeatedly attempted to stop Defendants' fraudulent billing practices by not only reporting the conduct to Defendants' officials, but also by educating Defendants' staff about the specific fraudulent billing practices and how to avoid engaging in them.

158.    Defendants were aware that Plaintiff had engaged in activities in furtherance of a potential action under the *qui tam* provisions of the Wisconsin False Claims for Medical Assistance Act. Defendants were also aware of Plaintiff's efforts to stop violations of Defendants' fraudulent billing practices.

159.    Because Plaintiff was engaged in activities that are protected under the Wisconsin False Claim for Medical Assistance Act's anti-retaliation provision, Wis. Stat. § 20.931(14), Defendants repeatedly retaliated against Plaintiff. Upon Plaintiff's initial reports of Defendants' fraudulent conduct, Defendants began severely harassing Plaintiff, which continued through the termination of Plaintiff's employment. When Plaintiff continued to attempt to stop Defendants' fraudulent conduct, Defendants' suspended her employment and then terminated her.

160.    As a direct and proximate result of the foregoing, Plaintiff has lost the benefit and privileges of employment, and has suffered additional economic and non-economic damages,

59

including severe emotional anguish and irreparable, continuing harm to her career. Plaintiff is entitled to all relief necessary to make her whole.

## PRAYER FOR RELIEF

Plaintiff demands judgment against the Defendants as follows:

a. That by reason of the violations of the False Claims Act alleged in Counts I, II, and III, this Court enter judgment in favor of the United States and against the Defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than Five Thousand Five Hundred Dollars ($5,500.00) and not more than Eleven Thousand Dollars ($11,000.00) for each violation of 31 U.S.C. § 3729;

b. That the Relator, as a *qui tam* Plaintiff in Counts I, II, and III, be awarded the maximum amount allowed pursuant to Section 3730(d) of the False Claims Act or any other applicable provision of law;

c. That by reason of the violations of the various State False Claims Act set forth in Counts IV-VIII, this Court enter judgment in favor of each of the States and against the Defendants in the maximum amount allowed by law;

d. That the Relator, as a qui tam Plaintiff in Counts IV-VIII, be awarded the maximum amounts allowed pursuant to the False Claims Acts or any other applicable provisions of law of the States on behalf those claims are brought;

e. That, by reason of Defendants' violation of the Employee Protection Provision of the False Claims Act, 31 U.S.C. § 3730(h), judgment be entered in favor of Plaintiff and against Defendants;

f. That, by reason of Defendants' violation of the Wisconsin False Claim for Medical Assistance Act's anti-retaliation provision, Wis. Stat. § 20.931(14), judgment be entered in favor of Plaintiff and against Defendanst;

g. That Plaintiff be awarded double her back-pay losses under the Employee Protection Provision of the False Claims Act, 31 U.S.C. § 3730(h), plus front pay, interest, costs, and attorneys' fees, and special damages for emotional distress and harm to her reputation;

h. That Plaintiff be awarded double her back-pay losses under the Employee Protection Provision of the Wisconsin False Claim for Medical Assistance Act, Wis. Stat. § 20.931(14), plus front pay, interest, costs, and attorneys' fees, and special damages for emotional distress and harm to her reputation;

i. That Plaintiff be re-instated to her former position, with all applicable raises;

j. That Plaintiff be awarded all costs of this action, including reasonable attorney's fees and court costs; and

k. That Plaintiffs have such other relief as the Court deems just and proper.

61

**JURY TRIAL DEMANDED**

Plaintiff demands that this matter be tried before a jury.


**CONSOLE LAW OFFICES LLC**



**DATED:** April 9, 2009          BY: _____

Carol A. Mager (17548)
Marjory P. Albee (28150)
1525 Locust St., 9th Floor
Philadelphia, PA 19102
(215) 545-7676
(215) 827-5101 (fax)

Attorneys for Plaintiff Tracy L. Lovvorn


**OF COUNSEL:**

Robert L. Vogel
Janet L. Goldstein
(*Pro Hac Vice* Motions Pending)
Vogel, Slade & Goldstein, LLP
1718 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20015
(202) 537-5900
(202) 537-5905 (fax)

David J. Marshall
Alexis H. Rickher
(*Pro Hac Vice* Motions Pending)
Katz, Marshall & Banks, LLP
1718 Connecticut Avenue, N.W., 6th Floor
Washington, D.C. 20009
(202) 202-299-1140
(202) 299-1148 (fax)

FILED
APR 09 2010
MICHAEL E. KUNZ, Clerk
By_____ Dep. Clerk